IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GLENN LASER                          *
                                     *
        v.                           *        Civil No. JFM-01-CV-2997
                                     *
PROVIDENT LIFE & ACCIDENT            *
    INSURANCE CO.                     *
                              *****

## MEMORANDUM

Plaintiff Glenn Laser has filed suit under the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. He challenges the denial by defendant Provident

Life & Accident Insurance Co. ("Provident") of his claim for long-term disability benefits. Both

parties have moved for summary judgment. For the reasons set forth below, both motions will

be denied, and the case will be remanded to Provident, the plan administrator.

I.

Laser was hired by Electromagnetic Sciences, Inc. ("ESI") in December 1996. (UPCL

168.[1]) As a senior field engineer, he was involved in the installation and testing of wireless

computer systems in hospitals and warehouses. (UPCL 522.) This dispute involves a claim for

long term disability benefits that Laser made to Provident in June 2000.[2] Provident both insures

---

[1]The 991-page administrative record in this case is set forth in full as Exhibit 1 to
Defendant's Memorandum and is cited by reference to Bates numbers. The record is divided
into two general parts: documents in the UPMS sequence, dealing with the policy at issue in this
dispute, and documents in the UPCL sequence, dealing with plaintiff's claim.

[2]The claim form is dated May 30, 2000 (UPCL 169), but was not received by Provident
until June 20, 2000. (Def.'s Mem. at 2.) The delay between Laser's completion of the claim
form and Provident's receipt of it is not material to this dispute.

1

and administers ESI's Group Long Term Disability Insurance Policy. (Def.'s Mot. ¶ 2.) Laser

sought benefits under the policy for three disabilities: paroxysmal supraventricular tachycardia

(PSVT), mitral valve prolapse, and hyperlipidemia. (UPCL 54.) PSVT, Laser's primary

diagnosis, is characterized by irregular, rapid heart rhythms and had resulted in his

hospitalization on numerous occasions while he worked at ESI.[3] (UPCL 498.)

Immediately before he applied for long term disability benefits, Laser underwent two

surgical procedures. On April 25, 2000, he underwent electrophysiology testing and a catheter

ablation,[4] which was intended to control Laser's abnormal, elevated heart rate. (UPCL 40-43,

474.) The second procedure, a uvulopalatopharyngoplasty[5] and tonsillectomy, was performed

May 10, 2000, to treat sleep apnea, from which Laser also suffers. (UPCL 474.) Although only

Laser's cardiac diagnoses were cited on an Attending Physician's Statement of Disability that

accompanied his claim, both his treating cardiologist, Dr. Hilary T. O'Herlihy, and Dr. Lee

Kleiman, the ear, nose, and throat specialist who performed the sleep apnea surgery, completed

the form. (UPCL 53.) The two-page statement indicated that Laser had suffered from cardiac

---

[3]Mitral valve prolapse is "excessive retrograde movement of one or both mitral valve
leaflets into the left atrium during left ventricular systole, often allowing mitral regurgitation
. . . ." Stedman's Medical Dictionary 1,455 (27th ed. 2000). Hyperlipidemia is "[t]he presence
of an abnormally high concentration of lipids in the circulating blood." Id. at 851, 1019.

[4]During the initial phase of this procedure, catheters were inserted into Laser's blood
vessels to study the functioning of his heart. (UPCL 40-43.) Laser then underwent the ablation
procedure. (Id.) An electrode catheter ablation is "a method of ablating the site of origin of
arrhythmias whereby high-energy electrical current is delivered by intravascular catheters."
Stedman's Medical Dictionary at 3.

[5]A uvulopalatopharyngoplasty is a surgical resection of mouth and throat tissue.
Stedman's Medical Dictionary at 1299, 1921.

symptoms since 1993, the year he began seeing Dr. O'Herlihy, and that these symptoms included an irregular heartbeat and dizziness. (UPCL 54.)

Before Provident could determine whether Laser qualified for long term disability benefits pursuant to this claim, it learned that Laser had fallen and fractured his ankle. (UPCL 473.) Provident therefore immediately began paying Laser benefits as a result of his ankle injury. (Id.) Laser received these benefits through August 20, 2000, the date after which Laser's orthopedist had indicated his ankle should be sufficiently healed that he could return to work. (Id.) After coverage for the ankle injury ended, Provident evaluated Laser's claimed cardiac disabilities.

The policy at issue in this case defines as "Totally Disabled" those covered persons who "are unable to perform all the material Duties of [their] Own Occupation on a full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy." (UPCL 475.) To be disabled, the person also must be under a physician's care and not be working in any occupation. (Id.) This definition applies during the covered person's "own occupation period," which for Laser is two years based upon his job classification.[6] (UPMS 390, UPCL 589.)

---

[6]After two years, employees in Laser's job category may continue to receive disability benefits if they can demonstrate that they cannot work "in any occupation for which they are or may become suited by education, training, or experience." (UPMS 385, 390.) Because Laser filed his claim during the period in which he was covered by the "own occupation" provision of the policy, and because Provident evaluated his claim under this provision, the "any occupation" provision is not relevant to this analysis.

3

Provident denied Laser's claim on September 26, 2000. (UPCL 472-75.) It agreed that Laser's medical records supported diagnoses of PSVT and hyperlipidemia.[7] (UPCL 474.) It further stated that it found Laser "did have restrictions and limitations supported from a cardiac standpoint [from] April 25, 2000 through May 8, 2000 due to the Ablation Procedure performed." (Id.) However, Provident found that "[n]o further restrictions and limitations were supported beyond May 8, 2000 from a cardiac standpoint." (Id.) It concluded that Laser was ineligible for long term disability benefits because he had not provided medical documentation that supported his inability to perform the material duties of his job as a senior field engineer.[8] (UPCL 473.)

Laser appealed, submitting additional medical documentation from Dr. O'Herlihy and a vocational analysis. Both Dr. O'Herlihy and the vocational counselor concluded that Laser was unable to perform his job in light of his medical problems and the job's physical demands, which included carrying heavy equipment, climbing ladders, and working from atop forklift platforms. (UPCL 497, 523.)

On June 15, 2001, Provident upheld its decision to deny Laser's claim. (UPCL 545-46.) It stated that a board-certified cardiologist on its staff had reviewed the additional information Laser submitted and had confirmed that "'the restrictions and limitations by the attending

---

[7] Provident found the diagnosis of mitral valve prolapse not supported by Laser's medical documentation. (UPCL 474.)

[8] Although Laser had suffered from heart problems prior to his employment with ESI, and thus prior to his coverage by this policy, Provident did not contend that Laser's claim was barred as a pre-existing condition. Rather, it cited only the fact that Laser did not meet its definition of total disability. (UPCL 545.)

4

physician seem arbitrary and inappropriate from a cardiac perspective beyond May 8, 2000.'"
(UPCL 545.)[9]

Laser filed a timely challenge to Provident's denial of benefits in this court, seeking, inter
alia, $32,400 in long term disability benefits, plus interest, that he contends are due to him under
the policy. (Compl. ¶ 23.) The suit is brought pursuant to the ERISA provision which allows a
plan beneficiary to sue "to recover benefits due to him under the terms of his plan . . . ." 29
U.S.C. § 1132(a)(1)(B).

II.

Analyzing the claim in this case involves a two-part inquiry. First, I will discuss the
appropriate standard of review. Then, I will apply that standard to the facts of this case, in order
to determine whether defendant's decision should be upheld.

A.

The starting point in determining the standard of review in an ERISA case is the language
of the policy or plan under which the benefits determination was made. As the Fourth Circuit
has explained: "When . . . a plan by its terms confers discretion on a fiduciary and the fiduciary
acts within the scope of conferred discretion, we defer to the fiduciary in accordance with well-
settled principles of trust law . . . . Thus, a trustee's discretionary decision will not be disturbed
if reasonable, even if the court itself would have reached a different conclusion." Booth v. Wal-
Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000). A decision

---

[9]On March 8, 2001, Laser's employer (since renamed EMS Technologies) had terminated
his employment retroactive to September 25, 2000, because he had been "unable" to return to
work. (Compl. Ex. C.) This year, an administrative law judge awarded Laser Social Security
disability benefits. (Pl.'s Opp'n Ex. 14.)

5

is reasonable if it is based on "substantial evidence" and was reached after a "deliberate, principled reasoning process." Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 234 (4th Cir. 1997).

The parties agree that the policy at issue in this case confers discretion upon the defendant.[10] Therefore, review under the abuse of discretion standard is warranted. See Booth, 201 F.3d at 342; Ellis, 126 F.3d at 232. However, this standard should be modified – and the deference granted by the court to the decision maker accordingly reduced – when the plan administrator operated under a conflict of interest. See id. at 233; Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995); Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993).

In this case, defendant's dual role in both administering and insuring ESI's plan creates at least the potential for a conflict of interest, because defendant "bears the financial consequences – and reaps the financial rewards – of its own coverage decisions." Bedrick v. Travelers Ins. Co., 93 F.3d 149, 151 (4th Cir. 1996).[11] Accordingly, I will apply the modified abuse of discretion standard as articulated by the Fourth Circuit in Bernstein and Doe. See also Booth, 201 F.3d at

---

[10]The policy gives Provident "full, exclusive, and discretionary authority to control, manage, and administer claims, and to interpret and resolve all questions arising out of the administration, interpretation, and application of this Policy." (UPMS 370.) This authority includes the right to determine eligibility for coverage, entitlement to benefits, and amount of benefits payable. (Id.) In assessing claims, the policy makes Provident "the sole judge of the standard of proof required in any claims for benefits . . . ." (UPMS 340.)

[11]The court in Bedrick explained that there are "two primary kinds of ERISA plans": those in which an employer funds the plan and an insurance company merely processes claims and serves as independent fiduciary for the employer, and "insurer-funded plans, where, in exchange for a premium from the employer, the insurer processes and pays claims and acts as plan administrator." 93 F.3d at 152 (emphasis in original). The policy at issue here is of the latter type.

343 n.2 (explaining that "[a] fiduciary's conflict of interest, in addition to serving as a factor in the reasonableness inquiry, may operate to reduce the deference given to a discretionary decision of that fiduciary").[12]

### B.

When a court evaluates the decision of an ERISA plan administrator under the modified abuse of discretion standard, "the question for the court is whether the administrators and fiduciaries abused their discretion in the context of a sliding-scale review, which comes down to whether plaintiff received a full and fair review."[13] Willis v. Baxter Int'l, Inc., 175 F. Supp. 2d 819, 831 (W.D.N.C. 2001). For the reasons set forth below, I cannot find that plaintiff received a full and fair review in this case.

---

[12]Defendant appears to assert that a reduction in deference is only appropriate if plaintiff can point to specific evidence that demonstrates that the conflict of interest affected defendant's decision, such as documents in the claim file that evidence "self-dealing or other irregularity . . . ." (Def.'s Reply at 1; see also Def.'s Mem. at 7-8.) I find no support in the case law for this argument. Rather, the courts within this circuit regularly apply the modified abuse of discretion standard or consider the conflict of interest as a factor in assessing reasonableness based on the potential for conflict in cases in which a plan administrator is also the plan insurer. See, e.g., Bernstein, 70 F.3d at 788 (applying modified standard based solely on fact that plan administrator was plan insurer). If such specific evidence were needed, however, defendant amply demonstrated a concern with keeping costs to a minimum by the manner in which it perfunctorily reviewed the evidence plaintiff submitted, as is discussed supra.

[13]The Fourth Circuit has explained that pursuant to the sliding-scale analysis, "[t]he more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." Ellis, 126 F.3d at 233.

1.

As an initial matter, I note that defendant's analysis of plaintiff's claim did not include

requesting that plaintiff undergo independent medical examination or testing, despite the fact that

the plan allows the defendant to "investigate" claims and states that defendant "may have

[claimant] examined at reasonable intervals by specialists of our choice including physicians,

psychologists, psychiatrists, or vocational evaluators." (UPMS 373.) Further, defendant did not

conduct "independent reviews" of the voluminous medical records plaintiff submitted, despite its

assertion to the contrary in its motion for summary judgment. (Def.'s Mot. ¶ 6.) Rather, it is

clear from the record and from defendant's supporting memorandum that the only reviews of the

medical evidence that defendant conducted were done by two nurses and a cardiologist employed

by the defendant. (See Def.'s Mem. at 14, 16.)

Although independent reviews of medical evidence and independent examinations of

claimants are not required, both are common in ERISA cases. See, e.g., Booth, 201 F.3d at 339

(noting two independent medical reviews conducted during claim appeals process); Elliott v.

Sara Lee Corp., 190 F.3d 601, 604 (4th Cir. 1999) (discussing independent examinations of

claimant by doctor and psychologist); Ellis, 126 F.3d at 231-33 (discussing three reviews by

independent medical consulting group); Adamson v. Metro. Life Ins. Co., 2001 WL 111227, at

*1 (D. Md. 2001) (noting two independent medical reviews). They can prove especially

significant in cases in which the plan administrator is operating under a conflict of interest or

rejects a treating doctor's opinion – both factors present here. See, e.g., Gallagher v. Reliance

Standard Ins. Co., 171 F. Supp. 2d 594, 603 (W.D.N.C. 2001) (discussing "[r]emarkabl[e]"

decision not to employ an independent physician to review claimant's medical information in

8

case applying the modified abuse of discretion standard); see also House v. Paul Revere Life Ins. Co., 241 F.3d 1045, 1048 (8th Cir. 2001) (explaining that if insurer was dissatisfied with the medical evidence submitted by claimant's cardiologist "it was entitled to require [claimant] to submit to an independent medical examination," and that "[h]ad it done so, [it] would have been entitled to discount [the treating doctor's] opinion entirely in favor of a contrary opinion produced by the independent examiner").[14]

Having chosen to forego independent testing and analysis, defendant was left with the medical evidence and opinions submitted by plaintiff. Defendant characterizes this evidence as follows: Plaintiff's two treating physicians, Drs. O'Herlihy and Kleiman, initially agreed that plaintiff could return to work without health restrictions. However, Dr. O'Herlihy later reversed course and asserted that plaintiff was unable to return to his job – an opinion that defendant argues was "inconsistent with his earlier opinions, statements, and records" and which contradicted Dr. Kleiman's opinion. (Def.'s Mem. at 12, 15.)

---

[14]Several recent cases within this circuit have found an abuse of discretion by plan administrators affiliated with this defendant under circumstances in which the administrators did not utilize any independent examination or testing, yet reached medical decisions that contradicted that of the claimant's own physician. For example, just this year, Judge Davis of this court expressed concern over the decision by UnumProvident, this defendant's parent company, to rely only upon a "'paper' review of incomplete records by Unum's in-house personnel" without ordering an independent medical examination of a claimant whose treating cardiologist was "emphatically insistent" that she was disabled. Watson v. UnumProvident Corp., 185 F. Supp. 2d 579, 581-82 (D. Md. 2002). Judge Davis' decision to grant summary judgment to the plaintiff-claimant ultimately turned, however, on his finding that UnumProvident had failed to detect at any point during its review process that it had received the records of the wrong patient. Id. at 585. See also Hines v. Unum Life Ins. Co. of Am., 110 F. Supp. 2d 458, 463 (W.D. Va. 2000) (criticizing, inter alia, rejection by another UnumProvident subsidiary of a treating doctor's opinion without obtaining additional "medical evidence, opinions, or testing").

While a plan administrator certainly acts within its discretion in resolving conflicting reports from a claimant's physicians, see Booth, 201 F.3d at 345, the administrative record indicates that this is not a case where defendant sorted through competing views of plaintiff's health and work ability as set forth by his physicians. Rather, the record reveals numerous instances in which defendant mischaracterized the evidence and one instance in which it made a potentially material error concerning Dr. Kleiman's medical specialty and, thus, his role in plaintiff's care. Defendant also repeatedly minimized and ignored the opinion of plaintiff's long-time treating cardiologist, Dr. O'Herlihy. Contrary to defendant's assertions, he was consistent – even emphatic – in insisting that plaintiff was unable to perform his physically demanding job.

2.

Plaintiff's doctors first communicated with defendant through the Attending Physician's Statement of Disability, as was noted previously. This document was jointly completed by Drs. O'Herlihy and Kleiman on May 24, 2000, and incorporated by reference into plaintiff's claim for benefits. (UPCL 53-54.) According to defendant, "both [physicians] concluded that Mr. Laser would be able to return to his own occupation by June 20, 2000, and that there would be no activities that he would be incapable of performing after that date." (Def.'s Mem. at 12.) Defendant ignores the fact that the document indicates that plaintiff did have ongoing cardiac-based restrictions. The document noted that plaintiff was able to do only "light work," involving

the lifting of no more than 20 pounds.[15]  (UPCL 54.)  It also identified plaintiff's cardiac

functional capacity as slightly to markedly limited.  (UPCL 53.)

Some initial confusion as to plaintiff's capabilities undoubtedly was warranted.  The two

doctors who filled out the form qualified one section of the responses regarding plaintiff's ability

to return to work as "Dr. Kleiman's decision" – although precisely what this qualification was

intended to cover is not clear because of the manner in which the form was completed.[16]  (UPCL

54.)  Still, this sloppiness by plaintiff's physicians did not permit defendant to ignore the rest of

the form, which clearly indicated ongoing concerns about plaintiff's cardiac health.  These

concerns were especially significant in light of the fact that it appeared from the qualification

"Dr. Kleiman's decision" that Dr. O'Herlihy, plaintiff's treating cardiologist, did not join in

viewing plaintiff as being able to return to unrestricted work activity on June 20, 2000.[17]

---

[15]According to a job analysis completed by ESI, plaintiff's job required the frequent
lifting of tools, test equipment, luggage, and network products that weighed up to 35 pounds, and
the occasional lifting of as much as 65 pounds, as well as sustained work on forklift platforms
and the climbing of ladders. (UPCL 433.)  Light duty was not available, the employer reported.
(Id.)

[16]The notation "Dr. Kleiman's decision" follows three questions and responses. (UPCL
54.)  The first asks for "the date from which the patient has been disabled"; the response was
"Jan. thru May." (Id.)  The second asks "[w]hen was or when will the patient be able to return
to" patient's occupation?; the response was "6/20/00." (Id.)  The third question asks "[w]hat
activities is he/she INCAPABLE of performing?"; the response was "None – 6/20/00." (Id.)  It is
unclear whether all three responses or only the last response was "Dr. Kleiman's decision."

[17]Defendant's failure to recognize the significance of the difference in opinion of the two
physicians is exacerbated by a material error that it made: believing that Dr. Kleiman was one of
plaintiff's treating cardiologists, rather than an ear, nose, and throat specialist whose care of
plaintiff apparently was limited to performing the uvulopalatopharyngoplasty and tonsillectomy.
In a letter submitted after briefing of these motions had been completed, defendant alerted the
court to the error in its briefs but did not explain how the error affected its argument. (See Letter
from J. Snowden Stanley, Jr., to Judge J. Frederick Motz, June 3, 2002.)  More troubling is the

11

Further, had defendant examined all the evidence it received, it could not have been confused for long. In numerous written and oral communications with defendant, Dr. O'Herlihy repeatedly opined that plaintiff could not return to his job for health reasons.

First among these communications was Dr. O'Herlihy's response to defendant's request for more information, directed to Carrie White, a claim representative, and dated June 22, 2000. The response included a completed Medical Assessment Form and letter. (UPCL 421-25.) On the form, Dr. O'Herlihy indicated that plaintiff had not suffered any heart arrhythmias since the ablation procedure two months earlier, but that arrhythmias had "been a problem [for plaintiff] since 1993." (UPCL 423.) Dr. O'Herlihy referred to the letter for restrictions imposed upon plaintiff by his condition. (UPCL 422.) In the letter, Dr. O'Herlihy stated:

> I have looked over his [Laser's] entire chart and he has had a rocky road both from a coronary standpoint and from other medical problems . . . .
>
> I cannot see this gentleman being able to resume the type of work that he has outlined to me[,] carrying heavy equipment plus luggage on his travels or the fact that he must often use high ladders and a forklift in the course of his work. I am not sure how his leg [sic] will be from an orthopedic standpoint but I know that he still suffers from periodic dizziness even though the heartbeat has stabilized since his Ablation procedure.
>
> It is my considered medical opinion that Mr. Laser should seriously be contemplating a long-term disability from his present occupation.

(UPCL 425.) On July 31, 2000, after receiving this additional material, White concluded that plaintiff had "[n]o R&L's [restrictions and limitations] from a cardiac standpoint [on] 6/20/00."

_____

fact that my review of the administrative record suggests the error was not just confined to defendant's attorneys. An "action plan" dated July 11, 2000, identified Dr. Kleiman in a margin note as plaintiff's cardiologist. (UPCL 586-87.) Although there is no evidence that defendant's medical staff was misled by this error, I am concerned about the impact the error may have had on the manner in which defendant handled plaintiff's claim – in addition to the manner in which defendant argued its case.

(UPCL 428.) In a letter to Laser, White wrote: "Our medical staff has reviewed [the Medical Assessment Form] and found that there are no restrictions and limitations from a cardiac standpoint that would prevent you from returning to work. On your Attending Physician's Statement, Dr. O'Herlihy noted that you would be able to return to work on 6-20-2000."[18] (UPCL 427.) She transferred the file to defendant's orthopedic unit, and canceled additional cardiac records that had been ordered. (UPCL 428.)

After the file was evaluated by the orthopedic unit and several months of benefits were paid to plaintiff for his ankle injury, plaintiff's claim file was returned to defendant's cardiac unit for further evaluation. It was during this part of the review process that defendant apparently concluded that plaintiff had no cardiac-based medical restrictions beyond May 8, 2000, as opposed to the June 20, 2000, date in White's letter. This determination formed the basis for defendant's subsequent decision to deny plaintiff's claim (and, later, his appeal). (UPCL 473-74, 545.) The source for the conclusion appears (although the record is not entirely clear on this point) to have been Pat Edwards, a registered nurse that defendant describes as "its Cardiac Clinician." (Def.'s Mem. at 13.) She evaluated plaintiff's medical records on September 5 and 15, 2000. (UPCL 449-50, 454.) On an internal consultation note, she stated that following plaintiff's April 25, 2000, ablation procedure, "R&L's [restrictions and limitations] are supported for 2 wks only due to moderate/heavy occupation . . . . The insured should be able to work in his

---

[18]It is unclear to whom White referred when she mentioned "[o]ur medical staff" in the July 31, 2000, letter. However, her notes of an August 31, 2000, telephone conversation indicated that a "clinical consultant" who was not a doctor had made the decision that Laser could return to work, although White did not name the individual. (UPCL 446.)

medium to heavy job with no further R&L's supported."[19]  (UPCL 454.)  May 8, 2000, was approximately two weeks from the date of plaintiff's ablation procedure.

In its September 26, 2000, letter to plaintiff, defendant cited various pieces of medical evidence as supporting its decision that plaintiff was not totally disabled: the fact that a post-surgical report indicated that plaintiff's electrophysiology/ablation procedure was considered successful; the fact that plaintiff did not experience any heart arrhythmias in the two weeks immediately after this surgery; the fact that plaintiff did not experience chest pain during a May 2000 cardiac stress test, which had to be stopped due to plaintiff's shortness of breath and fatigue; and the fact that plaintiff had been cleared to return to work by Dr. Kleiman, the ear, nose, and throat doctor.  (UPCL 474.)  Defendant also stated in the letter that it had discussed plaintiff's medical condition with Dr. O'Herlihy.  (Id.)  It acknowledged that Dr. O'Herlihy did not believe that plaintiff could carry heavy equipment because of his age (then 58) and tendency to fatigue easily, and that he believed plaintiff could not climb ladders because he suffered periodic bouts of dizziness of an unclear physiologic basis.[20]  (Id.)  However, it then addressed only Dr. O'Herlihy's concerns with plaintiff's ankle injury, concluding, "our records indicated

---

[19]Edwards forwarded her conclusions to Dr. Thomas Hashway, a cardiologist for the defendant, who briefly summarized the evidence and agreed that "[t]he record does not support any form of cardiac restrictions or limitations at this time.  The insured, from a cardiac viewpoint, is able to perform the material and substantial duties of his own occupation."  (UPCL 460.)

[20]Dizziness, chest pain, anginal equivalent pain, shortness of breath, fatigue, weakness, nausea, palpitations, and edema are listed as relevant symptoms on a "Medical Source Statement (Ability to Do Work-Related Activities-Cardiac)" form in the administrative record.  (UPCL 533.)  Thus, the existence of dizziness in a patient who has had a history of cardiac problems is potentially significant.

you were released from [the orthopedist's] care to return to work on August 21st." (Id.) No

where does the letter discuss or explain the selection of the May 8, 2000, date or how the

evidence supported this conclusion.[21]

Dr. O'Herlihy reiterated his concerns in a packet of materials plaintiff sent to defendant

as part of his appeal. Dr. O'Herlihy's office notes and associated laboratory reports and test

results through January 21, 2001, indicate that although plaintiff had suffered no more "spells of

tachyarrhythmias," he continued to suffer pain from his right ankle and high levels of cholesterol

and triglycerides. (UPCL 524-25, 527.) Further, a January 31, 2001, letter from Dr. O'Herlihy

indicates that plaintiff's broken ankle "has not healed well" and continues to cause the plaintiff

"considerable pain." (UPCL 523.) Lest there be any confusion about what level of work he

thought appropriate, Dr. O'Herlihy wrote to defendant: "I cannot see this gentleman being able to

resume the kind of work that he has outlined to me[,] carrying heavy equipment plus luggage in

his travels. Matter of fact he used to climb ladders and work off a forklift. HE CAN NEVER

RESUME THIS SORT OF ACTIVITY." (Id. (emphasis in original).)

Although Dr. O'Herlihy did not discuss plaintiff's cardiac conditions in this letter, he

submitted a "Medical Source Statement (Ability to Do Work-Related Activities-Cardiac)" dated

February 23, 2001, that indicated that Laser continued to have cardiac-based restrictions on his

ability to move, lift, and concentrate and thus was capable of only sedentary work. (UPCL 528-

33.) He checked boxes indicating that Laser suffered shortness of breath, fatigue, weakness, and

---

[21]May 8, 2000, was the date of an office visit plaintiff had with Dr. O'Herlihy. During
that visit, Dr. O'Herlihy cleared plaintiff for sleep apnea surgery. (UPCL 143-44, 527.)
However, he did not indicate plaintiff could return to work.

dizziness, resulting in marked limitation of physical activity. (UPCL 530.)  He also indicated

that Laser did not suffer palpitations "at present" but that they "could return," and that stress

played a "significant" role in triggering plaintiff's symptoms.  (UPCL 530.)

The evidence was again reviewed by a nurse, Pat Branham, and defendant's cardiologist.

(UPCL 542-44.)  In a letter denying plaintiff's appeal, defendant reiterated that "'the restrictions

and limitations by the attending physician seem arbitrary and inappropriate from a cardiac

perspective beyond May 8, 2000.'" (UPCL 545.)  This time, defendant cited several other pieces

of evidence as supporting its decision: that Dr. O'Herlihy had described the dizziness as a "vague

light-headedness" in the telephone conversation of September 20, 2000, prior to the initial denial,

and that there was "no mention of frank syncope in any of the new materials reviewed."[22]

(UPCL 545-46.)  Both statements appear intended to indicate that defendant questioned the

seriousness and objective basis for plaintiff's claims of dizziness.

3.

The issue of how much deference to accord a treating physician in an ERISA case has

been the subject of debate in the federal courts.  Several circuits have applied the "treating

physician rule" of Social Security cases in the ERISA context.  See Regula v. Delta Family-Care

Disability Survivorship Plan, 266 F.3d 1130, 1139 (9th Cir. 2001); Donaho v. FMC Corp., 74

F.3d 894, 901 (8th Cir. 1996).  This rule requires the fact-finder to defer to "the expert judgment

of a physician who has observed the patient's medical condition over a prolonged period of

_____

[22]"Syncope" is a "[l]oss of consciousness and postural tone caused by diminished cerebral blood flow." Stedman's Medical Dictionary at 1,745.  "Frank" means that an illness or symptom is manifest or clinically evident.  Id. at 714.

time," absent "persuasive contradictory evidence." Elliott, 190 F.3d at 607 (emphasis in original). Because the Fourth Circuit has not indicated that the treating physician rule should be applied in ERISA cases, see id., I will not apply it here. Still, that does not mean that a plan administrator is free to entirely disregard a treating physician's opinion. See, e.g., Pappas v. Reliance Standard Ins. Co., 20 F. Supp. 2d 923, 931 (E.D. Va. 1998) ("[I]t is clear that a disinterested decisionmaker . . . would not completely discount the opinion of a treating physician . . . ."). Especially when the administrator is operating under a conflict of interest, a court may view skeptically that administrator's decision to accord decisive weight to the opinions of its own staff and to minimize those of the treating doctor, as defendant did here. Cf. Hines, 110 F. Supp. 2d at 467 (explaining that "in those cases where the standard of review has been modified to counteract untoward influences, a treating physician should be given greater deference than an employee of the administrator/insurer").

The preceding examination of defendant's decision-making process indicates that it failed to consider all of plaintiff's medical evidence, failed to consider his injuries and illnesses in conjunction with one another, and took an "adversarial approach," Williamson v. A.T. Massey Coal Co., Inc., 56 F. Supp. 2d 656, 661 (S.D. W.Va. 1998), to the evidence presented. Cf. Willis, 175 F. Supp. 2d at 831 (finding abuse of discretion where decision maker "rejected a substantial amount of plaintiff's medical evidence" and "considered each impairment (and the supporting medical evidence) in isolation"). For example, in its denial letter, defendant cited plaintiff's acceptable performance on a cardiac stress test, but appears not to have considered the fact that plaintiff was unable to complete this test due to fatigue and shortness of breath. (UPCL 474.) Further, the stress test was intended only to help doctors determine whether plaintiff could

17

undergo sleep apnea surgery, not whether he was able to work for sustained periods at a demanding job. (UPCL 143-44.) Defendant also repeatedly cited only the prognosis for plaintiff's recovery from his ankle injury, ignoring Dr. O'Herlihy's repeated statements that plaintiff's ankle had not healed as quickly or as well as expected and continued to cause him pain.[23] Cf. Williamson, 56 F.Supp. 2d at 659 ("The flaw in the Plan's reasoning is its failure to consider [earlier and later] reports together, recognizing that the earlier reports when disability commenced would naturally suggest treatment and anticipate recovery . . . ."). More importantly, although defendant acknowledged that plaintiff's medical records supported diagnoses of PSVT and hyperlipidemia, it also viewed plaintiff's history of heart problems – the core of his disability claim – narrowly. It stressed only that plaintiff had not suffered any arrhythmias after the ablation procedure, discounting Dr. O'Herlihy's concerns about another potential cardiac symptom, dizziness. According to defendant's own clinical review, plaintiff had "a history of dizziness, possibly medication related . . . ." (UPCL 460.) As this court has previously stated, a diagnosis that "turns on subjective information" is not necessarily "less debilitating" and does not give "a plan administrator unbridled discretion to deny such claims." Brenner v. Hartford Life & Acc. Ins. Co., 2001 WL 224826, at *3 (D. Md. 2001); see also Willis, 175 F. Supp. 2d at 831 (rejecting plan administrator's requirement that claimant show "objective medical proof of subjective impairments").

---

[23]Although Dr. O'Herlihy is a cardiologist, not an orthopedist, common sense would suggest that defendant should not have entirely discounted any treating doctor's opinion concerning a poorly healed ankle fracture in a patient whose job entailed frequent work on ladders and forklift platforms.

Perhaps most significant among defendant's failings, however, was its apparent refusal to relate plaintiff's reported maladies to his physically demanding job. See, e.g., Pappas, 20 F. Supp. 2d at 930 (criticizing plan administrator for failing to address how claimant's symptoms affected her ability to perform the essential functions of her job, which court called "the central question presented"). This was a serious shortfall, given that the plan language makes a consideration of a claimant's occupation essential, defining "Total Disability" under the "own occupation" provision as occurring when a claimant cannot perform "all the material duties of [his] own occupation . . . ." (UPMS 386.) Although I agree with defendant that it was not necessarily obliged to commission a vocational study of plaintiff's particular job, see Gallagher, 171 F. Supp. 2d at 602, this does not mean that defendant acted reasonably when it viewed plaintiff's medical evidence in a vacuum. This failure is particularly problematic considering that, during the appeals process, Dr. O'Herlihy identified stress as a "significant" factor in contributing to plaintiff's symptoms and emphasized that plaintiff had marked limitations on physical activity even though he was comfortable at rest. (UPCL 530.) See also Hines, 110 F. Supp. 2d at 466 (criticizing insurer's failure to recognize that claimant's symptoms became incapacitating only under workplace stress).

Finally, I cannot find that defendant based its decision on "substantial evidence." Ellis, 126 F.3d at 233-34. Defendant's own staff concluded, without ever examining plaintiff or having him independently examined, that plaintiff could return to work without restrictions after May 8, 2000. It never grounded this conclusion in the evidence. Indeed, the conclusion was presented to plaintiff without any explanation whatsoever. Such an "ipse dixit conclusion[]" does not represent an adequate basis upon which to deny benefits under ERISA, especially when

19

the plan administrator is laboring under a conflict of interest. <u>Watson</u>, 185 F. Supp. 2d at 588;

<u>see also, e.g.</u>, <u>Gallagher</u>, 171 F. Supp. 2d at 603 (declining to grant deference where plan

administrator relied on its own nurse's opinion that the claimant could work without "supply[ing]

any basis for her conclusion"); <u>Hines</u>, 110 F. Supp. 2d at 468 ("Simply because [the insurer's

doctor] says it is so, does not make it so."). Defendant's reliance on the May 8 date in denying

plaintiff's appeal is particularly concerning. considering that plaintiff had submitted numerous

documents after the initial denial and defendant exhibited no sign that it reconsidered the

selection of this seemingly arbitrary date.

### III.

Having outlined numerous shortfalls in defendant's decision-making process and the

evidentiary support upon which it relied, I now resolve this case in a manner that may seem

paradoxical: I remand to the plan administrator, the defendant, to conduct a new, more searching

review of plaintiff's claim and to issue a new benefits determination. The Fourth Circuit has

indicated that while remand in ERISA cases should be used "'sparingly,'" it is the "most

appropriate" course in cases in which "'the plan itself commits the trustees to consider relevant

information which they failed to consider'" during their initial examination of a claim.[24] <u>Elliott</u>,

190 F.3d at 609 (citations omitted).

Remand is appropriate in this case for just the reason cited by the <u>Elliott</u> court. First,

defendant failed to consider plaintiff's disabilities in light of his physically demanding

---

[24]Even though it is within my discretion to reverse the administrator's decision, rather than remanding, this discretion is circumscribed. <u>See, e.g.</u>, <u>Bernstein</u>, 70 F.3d at 789 n.6 (explaining that a court may reverse in cases in which the administrator committed "clear error or acted in bad faith . . .").

occupation, as the plan itself obligates defendant to do.  Second, it is not clear that defendant had

adequate evidence upon which to deny benefits, considering its disregard of Dr. O'Herlihy's

opinion and the evidence he submitted.[25]  Additionally, remand is warranted in light of the error

defendant made regarding Dr. Kleiman's identity, which could have led it to minimize the

significance of Dr. O'Herlihy's opinion as plaintiff's primary treating cardiologist or to engage in

a less searching review than it otherwise would have.[26]

Date: _____                              _____
                                                   J. Frederick Motz
                                                   United States District Judge

---

[25]Although defendant's cardiologist did confer with Dr. O'Herlihy by telephone, his brief
notes memorializing the conversation – and defendant's selective use of them – make it appear
that the conversation was more oriented toward explaining away Dr. O'Herlihy's opinion than in
carefully exploring its foundation.  (UPCL 469, 474, 546.)

[26]On remand, plaintiff may present additional evidence to defendant, including the
opinion of the administrative law judge that plaintiff is entitled to Social Security disability
benefits.  (See Pl.'s Mem. at 14.)  However, I emphasize that I am not remanding for this purpose
alone.  I agree with defendant that it should not have to reopen its claims review process in order
to consider evidence that occurred after that process was closed.  (See Def.'s Reply at 4-6.)
However, since I am remanding for other reasons set forth above, plaintiff may present – and
defendant may consider – this evidence to the extent it is relevant.  Additionally, I note that
defendant may seek independent examination of plaintiff or independent analysis of his medical
records, if it determines either are necessary.  See, e.g., Pappas, 20 F. Supp. 2d at 928 n.15
(explaining that on remand a plan administrator could consider additional evidence and have the
claimant independently examined).

21